# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | | |
|---|---|---|
| JOE WILLIS, | ) | |
|     Plaintiff, | ) ) ) | |
| VS. | ) | No. 14-2362-JDT-dkv |
| FREDRICK READING, ET AL., | ) ) ) | |
|     Defendants. | ) | |

### ORDER DISMISSING COMPLAINT,
### CERTIFYING THAT AN APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
### AND NOTIFYING PLAINTIFF OF APPELLATE FILING FEE

On May 15, 2014, Plaintiff Joe Willis ("Willis"), an inmate at the Shelby County Criminal Justice Complex in Memphis, Tennessee, filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 accompanied by a motion to proceed *in forma pauperis*. (ECF Nos. 1 & 2). In an order issued May 16, 2014, the Court granted leave to proceed *in forma pauperis* and assessed the civil filing fee pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §§ 1915(a)-(b). (ECF No. 46.) The Clerk shall record the Defendants as Memphis Police Officer Fredrick Reading, the City of Memphis,[1] and the State of Tennessee.

On June 11, 2014, Plaintiff filed an amendment to his complaint (as of right) that added Grace Burton, MPD Case Coordinator and Homicide Detective, as a Defendant. (ECF No. 5.) The amendment is meant to supplement, rather than to supersede, the original complaint.

---

[1] The Court construes the allegations against the Memphis Police Department ("MPD") as an attempt to assert a claim against the City of Memphis. *See generally Hafo v. Melo*, 502 U.S. 21 (1991).

I. The Complaint and Amended Complaint

On September 19, 2014, Willis filed various documents pertaining to his then-pending criminal case, including a transcript of the preliminary hearing, the police report, and witness statements. (ECF No. 6.)

Count 1 of the complaint, asserted against Defendant Reading, alleges that, on June 15, 2013, a neighbor dropped Willis off at the Silver Spoon, a sports bar, around 1:00 a.m. Willis paid the cover charge and sat at the bar. At 2:30 a.m., it was announced that the club would be closing in thirty minutes. Willis walked outside and made some telephone calls in an attempt to find somebody to give him a ride home. Willis was unable to reach anybody. He then walked to the Enclave Apartments, where his barber, Blue, lives. Upon arriving, Willis did not see Blue's car in the parking lot. He then headed toward the Hickory Point Apartments, where a friend named Donald lived. (ECF No. 1 at 3-4.)

Willis crossed Hickory Hill Road and cut through the Fox Meadow Apartments to get to the Hickory Point Apartments. While walking through the Fox Meadow Apartments, Willis went behind a building to urinate. Willis heard a voice say, "Don't move!." When he looked to see who had spoken, he was shot in his right side. Willis turned and jumped behind a patio for cover. It was dark, and Willis did not know who had shot him. Defendant Reading and his partner, Officer Kimberly Shannon, who is not a party to this action, did not identify themselves as police officers. Defendant Reading allegedly fired another shot at Willis, shattering a glass door. Willis ran inside the apartment, and he heard Reading suggest that the officers run around to the front and cut him off. Willis turned around and, after looking around to see that the officers had left, he jumped back over the patio wall. Willis ran around the building, through the

parking lot, and back across Hickory Hill Road. The officers were chasing Willis, and he heard someone say, "Stop! Stop!" (*Id.* at 4-5.)

Willis ran to various places and apparently lost sight of the officers who were pursuing him. He eventually arrived at the apartment of a friend, who took him to a hospital in Southaven, Mississippi. (*Id.* at 6-7.)[2] Willis was questioned by two DeSoto County Sheriff's deputies and a nurse. The deputies told the hospital staff to air-lift Willis to the Regional Medical Center at Memphis ("The Med"), where he could be treated. The staff was informed that MPD officers would be waiting to detain Willis. Upon arrival at The Med, Willis had surgery and his wounds were bandaged. (*Id.* at 7-8.)

When Willis awakened, he was chained to the hospital bed. He asked an officer what had happened, and the officer replied that Plaintiff had been in the news all morning. Plaintiff stayed in the hospital for five days and, upon his release, was booked into the Jail. (*Id.*)

Defendant Reading is sued for allegedly shooting Willis while Willis was unarmed and facing away from Reading, in violation of Willis's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments. (*Id.* at 8-9.) Willis seeks compensatory and punitive damages. (*Id.* at 9.)

In Count 2, Willis has sued the City of Memphis because, on June 15, 2013, Defendant Burton filed an affidavit of complaint that accused Willis of committing two counts of aggravated burglary, theft of property under $500, and evading arrest. (*Id.* at 10.) Willis alleges that affidavit was false because crime scene investigators searched 2939 Wedge Cove, the residence into which Willis ran after fleeing from police, and found no latent fingerprints and no

---

[2] Willis alleges that another person he had encountered earlier offered to call 911, but Willis declined, explaining that he had outstanding warrants. (*Id.* at 6.)

shotgun. Officers found a woman's brown purse and a plastic jar in the back yard of 301 Oakland Hills Cove, but no latent prints were found on the items. (*Id.*)

Defendant Burton took statements from a victim, witnesses, and police officers. Reading was interviewed and questioned by detectives from the MPD's Inspection Services Bureau. Burton allegedly contacted the District Attorney General's Office, which declined to prosecute the officers involved in Willis's shooting. The shooting was determined to have been self-defense because Willis had allegedly pointed a shotgun at the officers. (*Id.* at 10-11.)

During an appearance at the Shelby County General Sessions Court on July 13, 2013, Willis asked his attorney, Assistant Public Defender Patrick A. Newport, for copies of his affidavit of complaint and arrest report. Newport got a copy of the affidavit of complaint. Newport attempted to get a copy of the arrest report from central records and was told that they would not release any information to him concerning Willis's case. (*Id.* at 11.) Willis wrote to the General Sessions Supervisor, Nelle Pallme, who is not a party to this action, regarding the arrest report. In a letter dated August 12, 2013, Pallme advised Willis that his arrest report was unavailable because it involved an allegation of an officer discharging his weapon. At that time, Willis stopped asking for the arrest report. (*Id.* at 11-12.)

On August 9, 2013, Willis or his family retained Timothy Wilson to represent him on the criminal charges. At the preliminary hearing, the arresting officers testified that they did not have the shotgun that was alleged to have been in Willis's possession or the items that Willis was alleged to have stolen from the residence. Despite the absence of evidence, probable cause was found because the officers testified that Willis had pointed a shotgun at them. (*Id.* at 12.) A grand jury indicted Willis on November 19, 2013, and he was arraigned on December 4, 2013. On December 12, 2013, Willis's court-appointed attorney, C.J. Barnes, provided him with the

discovery, including the arrest report, which had been withheld for six months. (*Id.*) The arrest report had allegedly been altered with the handwritten notation, "stole a handbag and jar of coins during burglary value $300." (*Id.* at 13.)

According to Willis, the MPD did not properly train Defendant Reading "because what [Reading] did on June 15, 2013 was reckless and unprofessional towards the Plaintiff." (*Id.*) The MPD allegedly conspired with Reading in violation of Willis's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments. (*Id.*) By charging Willis with a crime without probable cause, the MPD allegedly violated Willis's rights under the Fourth, Fifth, Sixth and Fourteenth Amendments and engaged in malicious prosecution. (*Id.*) The MPD also allegedly violated Willis's rights under the Sixth and Fourteenth Amendments by withholding the arrest report for six months. (*Id.*)

In Count 3, Willis is suing the City of Memphis because Defendant Reading allegedly used excessive force by shooting an unarmed citizen without probable cause. (*Id.*) Had Defendant Reading been properly trained, he allegedly would have handled the situation differently. (*Id.* at 16.)

The complaint seeks one million dollars in compensatory damages and one million dollars in punitive damages. (*Id.* at 14, 16.)

In his amendment, which was filed on June 11, 2014, Willis added a claim against Defendant Burton, the affiant on the affidavit of complaint that was used to obtain the issuance of an arrest warrant. (ECF No. 5 at PageID 44.) The affidavit of complaint stated as follows:

> On June 15, 2013, a male was found inside 2939 Wedge Cove as the result of a burglar alarm. Officers approached 2939 Wedge Cove and saw a male fleeing from inside 2939 Wedge Cove at the patio entrance. The male turned and pointed a shotgun at two uniformed Memphis Police Officers and one of the officers fired at the male. The male fled the scene and officers gave chase. Along the path that the suspect took running from officers he shed his clothing and other items, to

5

> include items taken from the burglary of 2939 Wedge Cove. Officers continued to pursue this suspect and while searching the area for the suspect, officers received a 911 call from a witness that advised a male approached him and said that he had been shot. The male used the witness's phone to call his mother. Officers then spoke with the mother and she advised that she talked to her son, Joe Willis. Willis showed up at a Mississippi hospital, with a gunshot wound and identified himself to hospital personnel as Joe Willis. Willis was flown to the MED a short time later and arrested.

(ECF No. 1-1 at PageID 23.)

Willis contends that Burton fabricated the information in the affidavit for the purpose of persuading the magistrate or clerk to sign the complaint and arrest warrant. The falsity of Burton's representations allegedly is demonstrated by the testimony at the preliminary hearing, where the victim testified that she could not identify Willis. (ECF No. 5 at PageID 44.) Defendant Reading testified that he saw Willis holding a shotgun but did not see him in possession of the purse or the bag of coins that he was charged with stealing. The other officer also did not see Willis with the stolen items. (*Id.* at PageID 45.) Willis contends that many police officers make false allegations that suspects resisted arrest or assaulted them. (*Id.* at PageID 46-47.) Willis claims that Burton's actions violated the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments. (*Id.* at PageID 44.)

Willis seeks $150,000 in compensatory damages and $150,000 in punitive damages against Defendant Burton. (*Id.* at PageID 47.)

By way of background, on November 19, 2013, a grand jury in Shelby County, Tennessee, returned an indictment charging Willis with two counts of aggravated assault, one count of aggravated burglary, one count of theft of property in the amount of $500 or less, and one count of evading arrest. *See* http://jssi.shelbycountytn.gov (Indictment # 13 05650). A jury found Willis guilty on all counts on June 25, 2015; the case is currently on appeal. *Id.*

II. Analysis

The Court is required to screen prisoner complaints and to dismiss any complaint, or any portion thereof, if the complaint—

    (1)    is frivolous, malicious, or fails to state a claim upon which relief may be granted; or

    (2)    seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(b); *see also* 28 U.S.C. § 1915(e)(2)(B).

In assessing whether the complaint in this case states a claim on which relief may be granted, the court applies the standards under Federal Rules of Civil Procedure 12(b)(6), as stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009), and in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007). *Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010). "Accepting all well-pleaded allegations in the complaint as true, the Court 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 681) (alteration in original). "[P]leadings that . . . are no more than conclusions . . . are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679; *see also Twombly*, 550 U.S. at 555 n.3 ("Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.").

"A complaint can be frivolous either factually or legally. Any complaint that is legally frivolous would *ipso facto* fail to state a claim upon which relief can be granted." *Hill*, 630 F.3d at 470 (citing *Neitzke v. Williams*, 490 U.S. 319, 325, 328-29 (1989)).

> Whether a complaint is factually frivolous under §§ 1915A(b)(1) and 1915(e)(2)(B)(i) is a separate issue from whether it fails to state a claim for relief. Statutes allowing a complaint to be dismissed as frivolous give "judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." *Neitzke*, 490 U.S. at 327, 109 S. Ct. 1827 (interpreting 28 U.S.C. § 1915). Unlike a dismissal for failure to state a claim, where a judge must accept all factual allegations as true, *Iqbal*, 129 S. Ct. at 1949-50, a judge does not have to accept "fantastic or delusional" factual allegations as true in prisoner complaints that are reviewed for frivolousness. *Neitzke*, 490 U.S. at 327-28, 109 S. Ct. 1827.

*Id.* at 471.

"*Pro se* complaints are to be held 'to less stringent standards than formal pleadings drafted by lawyers,' and should therefore be liberally construed." *Williams*, 631 F.3d at 383 (quoting *Martin v. Overton*, 391 F.3d 710, 712 (6th Cir. 2004)). *Pro se* litigants and prisoners are not exempt from the requirements of the Federal Rules of Civil Procedure. *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989); *see also Brown v. Matauszak*, No. 09-2259, 2011 WL 285251, at *5 (6th Cir. Jan. 31, 2011) (affirming dismissal of *pro se* complaint for failure to comply with "unique pleading requirements" and stating "a court cannot 'create a claim which [a plaintiff] has not spelled out in his pleading'") (quoting *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975)) (alteration in original); *Payne v. Sec'y of Treas.*, 73 F. App'x 836, 837 (6th Cir. 2003) (affirming *sua sponte* dismissal of complaint pursuant to Fed. R. Civ. P. 8(a)(2) and stating, "[n]either this court nor the district court is required to create Payne's claim for her"); *cf. Pliler v. Ford*, 542 U.S. 225, 231 (2004) ("District judges have no obligation to act as counsel or paralegal to *pro se* litigants."); *Young Bok Song v. Gipson*, 423 F. App'x 506,

510 (6th Cir. 2011) ("[W]e decline to affirmatively require courts to ferret out the strongest cause of action on behalf of *pro se* litigants. Not only would that duty be overly burdensome, it would transform the courts from neutral arbiters of disputes into advocates for a particular party. While courts are properly charged with protecting the rights of all who come before it, that responsibility does not encompass advising litigants as to what legal theories they should pursue.").

Willis filed his 19-page, handwritten complaint pursuant to 42 U.S.C. § 1983. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) a deprivation of rights secured by the "Constitution and laws" of the United States (2) committed by a defendant acting under color of state law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

Willis's claims against Defendants Reading and Burton in their official capacities are asserted against the City of Memphis, which is also a named party in this case. When a § 1983 claim is made against a municipality, a court must analyze two distinct issues: (1) whether the plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality

is responsible for that violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). The second issue is dispositive of Willis's claims against the City of Memphis.

A local government "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994); *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994). A municipality cannot be held responsible for a constitutional deprivation unless there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation. *Monell*, 436 U.S. at 691-92; *Deaton v. Montgomery Co., Ohio*, 989 F.2d 885, 889 (6th Cir. 1993). To demonstrate municipal liability, a plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)). "Where a government 'custom has not received formal approval through the body's official decisionmaking channels,' such a custom may still be the subject of a § 1983 suit." *Alkire*, 330 F.3d at 815 (quoting *Monell*, 436 U.S. at 690-91). The policy or custom "must be 'the moving force of the constitutional violation' in order to establish the liability of a government body under § 1983." *Searcy*, 38 F.3d at 286 (quoting *Polk Co. v. Dodson*, 454 U.S. 312, 326 (1981) (citation omitted)). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 138 (1988) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479-80 (1986)) (emphasis in original).

Although civil rights plaintiffs are not required to plead the facts demonstrating municipal liability with particularity, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993), the complaint must be sufficient to put the municipality on notice of the plaintiff's theory of liability, *see, e.g., Fowler v. Campbell*, Civil Action No. 3:06CV-P610-H, 2007 WL 1035007, at *2 (W.D. Ky. Mar. 30, 2007); *Yeackering v. Ankrom*, No. 4:05-CV-00018-M, 2005 WL 1877964, at *2 (W.D. Ky. Aug. 5, 2005); *Oliver v. City of Memphis*, No. 04-2074-B, 2004 WL 3316242, at *4 (W.D. Tenn. Dec. 2, 2004); *cf. Raub v. Correctional Med. Servs., Inc.*, No. 06- 13942, 2008 WL 160611, at *2 (E.D. Mich. Jan. 15, 2008) (denying motion to dismiss where complaint contained conclusory allegations of a custom or practice); *Cleary v. County of Macomb*, No. 06- 15505, 2007 WL 2669102, at *20 (E.D. Mich. Sept. 6, 2007) (same); *Morningstar v. City of Detroit*, No. 06-11073, 2007 WL 2669156, at *8 (E.D. Mich. Sept. 6, 2007) (same); *Chidester v. City of Memphis*, No. 02-2556 MA/A, 2006 WL 1421099, at *3 (W.D. Tenn. June 15, 2005).

Here, the complaint alleges that the City of Memphis is liable because it makes hiring policy and training policy for the MPD. (ECF No. 1 at 16.) Willis alleges that, "had [Defendant Reading] been adaquately [sic] trained he would've conducted the situation different, but since he didn't, that placed liability on him, and his municipal as well for the pattern of constitutional violations." (*Id.*) This allegation is entirely conclusory.

Willis has no claim against the State of Tennessee under § 1983. The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment has been construed to

prohibit citizens from suing their own states in federal court. *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 472 (1987); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Employees of Dep't of Pub. Health & Welfare v. Mo. Dep't of Pub. Health & Welfare*, 411 U.S. 279, 280 (1973); *see also Va. Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011) ("A State may waive its sovereign immunity at its pleasure, and in some circumstances Congress may abrogate it by appropriate legislation. But absent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State." (citation and footnote omitted)). By its terms, the Eleventh Amendment bars all suits, regardless of the relief sought. *Pennhurst*, 465 U.S. at 100-01. Tennessee has not waived its sovereign immunity. Tenn. Code Ann. § 20-13-102(a). Moreover, a state is not a person within the meaning of 42 U.S.C. § 1983. *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

Willis alleges that Defendant Reading subjected him to excessive force by shooting him while Willis was unarmed and facing away from Reading, in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (ECF No. 1 at 8-9.) However, Willis was convicted on the two counts of aggravated assault with which he was charged, the factual premise of which was that he pointed a shotgun at Reading and his partner. If Willis were to succeed on his claim that he was shot while unarmed and facing away from Reading, it would call into question the validity of those convictions. Therefore, the excessive force claim is barred by *Heck v. Humphrey*, in which the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28

U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. 477, 486-87 (1994) (footnotes omitted). *See also Schilling v. White*, 58 F.3d 1081, 1086 (6th Cir. 1995) (same) (footnotes omitted). Willis has no cause of action under § 1983 if the claims in that action hinge on factual proof that would call into question the validity of a state court order directing his confinement unless and until any prosecution is terminated in his favor, his conviction is set aside, or the confinement is declared illegal. *Heck*, 512 U.S. at 481-82; *Schilling*, 58 F.3d at 1086. None of those events has happened in this case.

The complaint does not state a valid claim against any defendant under the Fifth,[3] Sixth[4] and Eighth Amendments.[5]

---

[3] The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. False arrest and malicious prosecution claims are properly analyzed under the Fourth Amendment. *Albright v. Oliver,* 510 U.S. 266, 274-75 (1994).

[4] The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. None of Plaintiff's allegations implicate the Sixth Amendment.

The complaint does not state a valid claim for false arrest against Defendant Burton arising from her signature on the affidavit of complaint. A Fourth Amendment claim for false arrest requires an arrest without probable cause. *See, e.g., Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008); *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) ("Today it is well established that an arrest without probable cause violates the Fourth Amendment."). Probable cause exists where a suspect is arrested pursuant to a facially valid warrant[6] or where "'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Crockett*, 316 F.3d at 580 (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)); *see also Wolfe v. Perry*, 412 F.3d 707, 717 (6th Cir. 2005) ("probable cause necessary to justify an arrest is defined as 'whether at that moment [of the arrest] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [arrestee] had committed or was committing an offense'" (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)) (alterations in original)); *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000).

The amended complaint alleges that the falsity of the statements in the affidavit of complaint are demonstrated by the testimony at the preliminary hearing, where the victim

---

[5] The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Claims that an arresting officer used excessive force are properly analyzed under the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 397-99 (1989).

[6] *Baker v. McCollan*, 443 U.S. 137, 142-46 (1979) (arrest and detention for three days under warrant issued in plaintiff's name but meant for his brother did not state a Fourth Amendment claim); *see Masters v. Crouch*, 872 F.2d 1248, 1252-53 (6th Cir. 1989) (dismissing claim where warrant issued in error).

testified that she could not identify Willis. (ECF No. 5 at PageID 44.) The preliminary hearing testimony was not available to Defendant Burton when she signed the affidavit of complaint; therefore, the evidence introduced at that hearing cannot be used to support Willis's claim against Burton.

The police report and contemporaneous witness statements provide ample support for Defendant Burton's affidavit. On June 15, 2013, Defendant Burton took the statements of Officer Kimberly Shannon, Defendant Reading's partner, and the victim, Carolyn McCollum. McCollum advised Burton that she was away from home when she got an email from her alarm company that motion had been detected at "door 5." (ECF No. 6 at PageID 117.) After checking with her boyfriend that he was not at the house and had not set the alarm, McCollum drove to her house. She stated that, "As I was getting out of my car I looked up and could see the shadow of someone in the upstairs of my apartment." (*Id.*) McCollum flagged down the police officers who were responding to the alarm call and told them that someone was in her apartment. (*Id.*) McCollum stated that, "[o]nce we got back to my apartment the officers got out with their flashlight and Wycell[, the father of McCollum's child,] told them that he heard something in the back in the field. The officers ran toward the back and I then heard the officers say don't move and then two shots." (*Id.*) In response to whether anything had been taken from her house, McCollum replied, "Micheal [sic] Kors brown and beige purse that the officers found by a ditch and my son's piggy bank containing assorted coins." (*Id.*) McCollum told the police that she did not know the person who was responsible for the burglary. (*Id.* at PageID 116.) Nobody had permission to be present in her home when she was not there. (*Id.* at PageID 117.)

Defendant Burton also took the statement of Officer Shannon, who stated that, on June 15, 2013, she and Defendant Reading responded to an alarm call. (ECF No. 6 at PageID 111-12.) Shannon provided the following description of the events:

> I got the call at 0305. I was in the area of Getwell and Mallory and so was Officer Reading. We trailed each other to the call. GPS lead us straight to Wedge Street but when we got there, there was a gate, just as we were turning around the victim flagged us down. At the same time the dispatcher was upgrading the call, advising that the victim stated someone was still in the house. After, Officer Reading spoke with the victim he made his u turn and I followed him into the complex. Apparently, we passed the street that the victim's house was on, but the victim who was following us started flashing her lights. So, we get turned around and Officer Reading turned around first and we went down the street that the victim said her home was on. We go to where the victim's home was located at. Officer Reading gets out of his vehicle and I get out of my vehicle, but I'm telling the victim's to stay back. The victim advised they still hear him in the house. I kind of heard some noises cause I was parked next to the apartment. Officer Reading goes to the rear of the apartments and I started going to the rear of the apartments. We were both outside the patio fence and that's when we see him come out the patio door with a shotgun in his hands. I was two or three yards from Officer Reading at an angle. I was about six feet from the suspect as he is exiting the patio door. Officer Reading gives the suspect verbal commands to stop and the suspect started running southbound jumping over the fences. The whole time Officer Reading was giving verbal commands. We are chasing and when he gets to apartment 2945, he tries to open the patio door. The door didn't open so he tries the door and turns real quick and points the shotgun at Officer Reading. Officer Reading is about eight to nine feet away from the suspect. Officer Reading continued to give the suspect commands, he did not comply and Officer Reading fired two shots. The glass breaks and the suspect runs through. That's when I doubled back and I went to the front of the apartments where I see the suspect exiting the front of 2945. He runs eastbound across the field toward Hickory Hill. I loose [sic] sight of him because of a privacy fence. Once he passed the privacy fence I can't see him anymore. Officer Reading and I continue to search the area for him on foot. I put out a broadcast as I was chasing him. So, a lot of cars were in the area. A couple minutes later I see the suspect again running next to the Nursing Home on Hickory Hill. He was on the other side of the wrought iron fence. He kind of runs northbound and we loose [sic] sight of him again, that's the last I saw of him. After that, I could hear officers on the radio saying that they located a hat, glove and the red shirt. Lt. Wong arrived and told me to go back to the original scene.

(*Id.* at PageID 112-13.)[7] A supplement to the police report by Sergeant Clarence Mabon states that after Willis fled, "[o]ther officers arrived in the area and noticed articles (purse, piggy bank, t-shirt with hole) in the area that the suspect had dropped." (*Id.* at PageID 75.)

The information available to Defendant Burton when she signed her affidavit was more than sufficient to justify the charges against Willis. Willis was charged with two counts of aggravated assault because he pointed a shotgun in the direction of Officers Reading and Shannon. Under Tennessee law, aggravated assault is an act that intentionally or knowingly "causes another to reasonably fear imminent bodily injury" involving "the use or display of a deadly weapon." Tenn. Code Ann. § 39-13-101(a)(2). "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building . . . with intent to commit a felony, theft or assault." *Id.* § 39-14-402(a)(1). Aggravated burglary is a burglary involving a habitation. *Id.* § 39-14-403(a). Willis was charged with aggravated burglary because he broke into McCollum's apartment with the intention to commit a theft. Willis was also charged with theft of property valued at less than $500 and with resisting arrest.

For the foregoing reasons, Willis's complaint is subject to dismissal in its entirety for failure to state a claim on which relief may be granted.

### III. Standard for Leave to Amend

The Sixth Circuit has held that a district court may allow a prisoner to amend his complaint to avoid a *sua sponte* dismissal under the PLRA. *LaFountain v. Harry*, 716 F.3d 944, 951 (6th Cir. 2013); *see also Brown v. R.I.*, No. 12-1403, 2013 WL 646489, at *1 (1st Cir. Feb. 22, 2013) (per curiam) ("Ordinarily, before dismissal for failure to state a claim is ordered, some

---

[7] Defendant Reading also gave a statement to two detectives on June 16, 2013, which was transcribed on September 19, 2013. (*Id.* at PageID 104-10.) It is unclear whether this statement was available to Defendant Burton when she signed her affidavit.

form of notice and an opportunity to cure the deficiencies in the complaint must be afforded."). Leave to amend is not required where a deficiency cannot be cured. *Brown*, 2013 WL 646489, at *1; *Gonzalez-Gonzalez v. United States*, 257 F.3d 31, 37 (1st Cir. 2001) ("This does not mean, of course, that every *sua sponte* dismissal entered without prior notice to the plaintiff automatically must be reversed. If it is crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile, then a *sua sponte* dismissal may stand."); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 114 (3d Cir. 2002) ("*in forma pauperis* plaintiffs who file complaints subject to dismissal under Rule 12(b)(6) should receive leave to amend unless amendment would be inequitable or futile"); *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001) ("We agree with the majority view that sua sponte dismissal of a meritless complaint that cannot be salvaged by amendment comports with due process and does not infringe the right of access to the courts."). In this case, because the deficiencies in Willis's complaint cannot be cured, leave to amend is not warranted.

IV. Appeal Issues

Pursuant to 28 U.S.C. §1915(a)(3), the Court must also consider whether an appeal by Willis in this case would be taken in good faith. The good faith standard is an objective one. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). The test for whether an appeal is taken in good faith is whether the litigant seeks appellate review of any issue that is not frivolous. *Id.* It would be inconsistent for a district court to determine that a complaint should be dismissed prior to service on the Defendants, but has sufficient merit to support an appeal *in forma pauperis*. *See Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983). The same considerations that lead the Court to dismiss this case for failure to state a claim also compel the conclusion that an appeal would not be taken in good faith.

V. Conclusion

The Court DISMISSES Willis's complaint for failure to state a claim on which relief can be granted, pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii)-(iii) and 1915A(b)(1)-(2). Leave to amend is DENIED because the deficiencies in Willis's complaint cannot be cured. It is also CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Willis would not be taken in good faith.

The Court must also address the assessment of the $505 appellate filing fee if Willis nevertheless appeals the dismissal of this case. A certification that an appeal is not taken in good faith does not affect an indigent prisoner plaintiff's ability to take advantage of the installment procedures contained in § 1915(b). *See McGore v. Wrigglesworth*, 114 F.3d 601, 610-11 (6th Cir. 1997), *partially overruled on other grounds by LaFountain*, 716 F.3d at 951. *McGore* sets out specific procedures for implementing the PLRA, 28 U.S.C. § 1915(a)-(b). Therefore, Willis is instructed that if he wishes to take advantage of the installment procedures for paying the appellate filing fee, he must comply with the procedures set out in *McGore* and § 1915(a)(2) by filing an updated *in forma pauperis* affidavit and a current, certified copy of his inmate trust account for the six months immediately preceding the filing of the notice of appeal.

For analysis under 28 U.S.C. § 1915(g) of future filings, if any, by Willis, this is the first dismissal of one of his cases as frivolous or for failure to state a claim. This "strike" shall take effect when judgment is entered. *Coleman v. Tollefson*, 135 S. Ct. 1759, 1763-64 (2015).

The Clerk is directed to prepare a judgment.

IT IS SO ORDERED.

 s/ **James D. Todd**
JAMES D. TODD
UNITED STATES DISTRICT JUDGE